**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X    Case No. 22-cv-10388

JESSICA CUEVAS,

                      **COMPLAINT**

           Plaintiff,

     - against -               **PLAINTIFF DEMANDS**
                              **A TRIAL BY JURY**

MOUNT SINAI HEALTH SYSTEM, INC.

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff JESSICA CUEVAS ("Plaintiff") by her attorneys, Phillips & Associates Attorneys at Law, PLLC, hereby complains of the Defendant MOUNT SINAI HEALTH SYSTEM, INC., upon personal knowledge, as well as information and belief, by alleging and averring as follows:

## NATURE OF THE CASE

1. Plaintiff is a hard-working and responsible worker who was employed as a Medical Assistant II at Defendant Mount Sinai Hospital's Endocrinology Department for over five years.

2. Plaintiff is a light-skinned Latina woman.

3. Plaintiff was subjected to a hostile work environment caused by her direct supervisors and a co-worker because of her skin color, race, and national origin.

4. Plaintiff also experienced and witnessed her co-worker repeatedly fail to follow safety practices and medical protocol, harming unwitting patients who were undergoing medical procedures, including biopsies.

5. Plaintiff repeatedly complained and objected, in writing and orally, to supervisors and

1

Labor Relations staff about the discrimination against her and her co-worker's violations of patients' rights to safe and quality care.

6. Defendant failed to investigate or effectively remediate the documented discrimination to the detriment of Plaintiff, and the documented health and safety violations, to the detriment of Defendant's patients.

7. Instead, Defendant engaged in a campaign of ongoing retaliation against Plaintiff for complaining and reporting the illegal conduct, up to and including, constructively discharging her.

8. Plaintiff brings this action alleging that Defendant has violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, ("Title VII"), 42 U.S.C. 1981 ("Section 1981"), the New York State Human Rights Law, New York State Executive Law, §§ 296 *et seq.* ("NYSHRL"), The New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq.* ("NYCHRL"), and The New York Labor Law § 742 *et seq.* ("Whistleblowers Statute").

9. Plaintiff seeks damages, as well as injunctive and declaratory relief, to redress the injuries she has suffered as a result of being discriminated against and subjected to a hostile work environment on the basis of her skin color, race, and national origin and for being retaliated against, including being constructively discharged, because of her complaints of discrimination and whistleblowing on behalf of patients.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

10. Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

11. The Court has supplemental jurisdiction over the claims of Plaintiff brought under state law pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as the Defendant resides within the Southern District of New York or the acts complained of occurred therein.

13. By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 18, 2022; (b) receiving a Notice of Right to Sue from the EEOC on September 13, 2022; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC; and (d) contemporaneously with the filing of this Complaint, mailing a copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A; a copy of the transmittal letter to the NYCCHR, *et ano.*, is annexed hereto as Exhibit B.

## PARTIES

14. Plaintiff is a resident of the State of New York, New York County.

15. Plaintiff is a 35-year-old light-skinned Latina woman.

16. Defendant Mount Sinai Health System is a domestic not-for-profit corporation licensed to do business in the State of New York.

17. Defendant Mount Sinai Health System is an integrated healthcare system

encompassing eight hospitals in the New York City Metropolitan area.

18. One of Defendant's hospitals is Mount Sinai Hospital ("Mount Sinai"), located at 5 E. 98th Street, New York, New York.

19. At all relevant times, Defendant Mount Sinai met the definition of "employer" and is subject to the applicable statutes.

20. At all relevant times, Plaintiff was an employee of the Defendant Mount Sinai, as defined by all the applicable statutes.

21. At all relevant times, Defendant Mount Sinai had more than 500 employees.

## MATERIAL FACTS

### Background

22. Plaintiff began her employment with Defendant Mount Sinai in or around 2016.

23. Before being constructively discharged in December 2021, Plaintiff held the position of Medical Assistant II in the Endocrinology Department ("Department") at the 205 East 98th Street location.

24. Plaintiff worked full-time earning $24/hour and $36/hour for time and a half overtime pay.

25. The Department was comprised of approximately 20 Medical Assistants, and upon information and belief, Plaintiff was the only light-skinned Latina employee among them. Upon information and belief, none of her co-workers identified as white, light-skinned Hispanic, Latina or Latino.

26. As Medical Assistant II, Plaintiff provided all manner of support to patients and doctors in the Department and performed medical procedures on patients, including

phlebotomy, thyroid biopsy, allergy patch testing, urinalysis, spirometry, and electrocardiogram.

27.   As a primary and senior Medical Assistant in the Department, Plaintiff took on increased responsibilities over time, such as ensuring coverage for the doctors, organizing and reordering supplies, keeping the cabinets stocked, and cleaning the lab and nurse's station.

28.   Plaintiff was a dedicated, hard-working, and responsible employee. The doctors that Plaintiff worked with often spoke highly of her excellent work and professionalism in carrying out her job and interacting with the patients. The doctors that Plaintiff regularly interacted with did *not* have the authority to hire, fire, or affect the terms, conditions and privileges of Plaintiff's employment.

29.   Instead, Plaintiff reported to three supervisors overseeing her department: 1) Bernard Morisset ("Morisset"), Team Leader; 2) Paula Wilson ("Wilson"), Nurse Manager; and 3) Indira Weber ("Weber"), Practice Manager.

30.   Morisset had the authority to hire, fire, and affect the terms, conditions and privileges of Plaintiff's employment or had the power to influence the decisionmakers of the same.

31.   Wilson had the authority to hire, fire, and affect the terms, conditions and privileges of Plaintiff's employment or had the power to influence the decisionmakers of the same.

32.   Weber had the authority to hire, fire, and affect the terms, conditions and privileges of Plaintiff's employment or had the power to influence the decisionmakers of the same.

33.   Morisset, upon information and belief, identifies as Black and/or Caribbean, and

presents as dark-skinned.

34.    Wilson, upon information and belief, identifies as Black and/or Caribbean, and presents as dark-skinned.

35.    Weber, upon information and belief, identifies as Puerto Rican and presents as medium-toned in skin complexion.

36.    Morisset, Wilson, and Weber reported to Dominique Archer ("Archer"), Director, who oversaw Plaintiff's Department.

37.    Archer had the authority to hire, fire, and affect the terms, conditions and privileges of Plaintiff's employment.

38.    Archer, upon information and belief, identifies as Black.

39.    Morisset was the supervisor that Plaintiff had the most frequent and significant interaction with, and Plaintiff reported to him on a daily basis. Morisset made the schedules for the Medical Assistants, approved breaks, and approved time off.

## Hostile Work Environment

40.    Starting in or around 2018 and continuing until her constructive termination in December 2021, Morisset began treating Plaintiff in a hostile, intimidating, and demeaning manner because of her color, race, and national origin. Morisset did not treat the other medical assistants, who were not light-skinned Latina, in a hostile, intimidating, or demeaning manner.

41.    By way of example, Morisset did the following:

a.    When in the same room with Plaintiff, he would act violently such as by slamming things around, slamming cabinets shut, and in one instance purposely

6

ripping the gloves unit off the wall in the lab.

b.  He further intimidated Plaintiff by shouting at her, and shouting over her, when she tried to speak.

c.  When not shouting, he often spoke to Plaintiff in a low, threatening tone of voice.

d.  When Plaintiff needed assistance during the performance of her duties, and Morisset was present to cover, he would blatantly ignore her requests.

e.  When working in the same area as Plaintiff, he would purposely leave areas dirty and unstocked, break equipment, and leave unlabeled specimens on the countertops, knowing Plaintiff would need to clean and attend to everything he left in disarray.

42.  The incidents and occurrences described supra are representative of the hostile work environment Plaintiff endured during her employment, but do not reflect each and every discriminatory incident that occurred.

<u>Discriminatory and Adverse Treatment</u>

43.  Similarly, starting in or around 2018 and continuing until her constructive termination in December 2021, Morisset intentionally provoked, sabotaged, and adversely affected the terms, conditions and privileges of Plaintiff's employment because of her color, race, and national origin. Morisset did not provoke, sabotage, or adversely affect the terms, conditions and privileges of employment of any of the other medical assistants that he oversaw, who were not light-skinned Latina.

44.  By way of example, Morisset did the following:

a.  Morisset overbooked Plaintiff on shifts, not allowing Plaintiff to take breaks by

failing to ensure she had coverage for breaks.

b.  Morisset unfairly criticized Plaintiff's performance, verbally and in writing, lying about deficiencies that were not true or accurate reflections of her performance.

c.  Morisset denied Plaintiff her previously planned and approved leave as further punishment and retaliation.

d.  Morisset failed to give Plaintiff raises to her pay that were appropriate and justified.

45.  Also, on or about July 24, 2019, while working, Plaintiff experienced a relapse of an injury involving three herniated disks infringing on a nerve in her back. Plaintiff, who was in excruciating pain, received a note from her physician excusing her from work to care for her condition. Yet, Plaintiff could not reach any of her supervisors for hours, even over email, which was unusual.  When she finally reached Morisset, she explained her situation and provided him with the doctor's note. Morisset delayed allowing Plaintiff to leave, telling her she could only leave after she covered a coworker's break that afternoon. Ultimately, he did not allow her to leave work until around 3:00 p.m. in the afternoon, hours after her request.

46.  On Plaintiff's 2018 and 2019 annual written performance appraisals, Morisset scored her unfairly and lodged undeserved and inaccurate criticisms of Plaintiff's work ethic.

47.  The criticisms were unexpected to Plaintiff because, in addition to working responsibly and diligently at all times, she consistently received positive feedback from doctors, patients, and many co-workers.

48.     In 2019, believing the negative feedback to be a continuation of Morisset's campaign of hostility rather than an accurate assessment, Plaintiff wrote in relevant part before signing: "This is the first time this has been brought to my attention. Bernard [Morisset] never told me nor was I informed by anyone this was an issue. I was not given time to make any adjustments or improve the concern."

49.     In retaliation, Morisset called her into his office and asked Plaintiff in an intimidating and hostile manner, in sum and substance, "What is your issue?" Plaintiff was afraid to speak up further due to Morisset's past history of aggression towards her and said nothing.

50.     Plaintiff, but not other co-workers, was consistently denied appropriate lunch coverage, resulting in a failure to provide her breaks and resulting in a loss of wages.

51.     At the height of the COVID-19 pandemic, Plaintiff, who was and is immunocompromised, was the only Medical Assistant in her group to wear full personal protective gear, including a head covering, while working. On May 21, 2020, Morisset demeaned and humiliated Plaintiff by emailing the entire group of Medical Assistants to chastise Plaintiff for using a head covering and stating that no one should be doing so – despite no such policy existing in the Department. Plaintiff felt at an increased risk of infection due to this arbitrary rule, apparently directed to her alone in the Department.

52.     The incidents and occurrences described supra are representative of the discriminatory adverse treatment Plaintiff endured during her employment, but do not reflect each and every discriminatory incident that occurred.

<u>Complaints and Retaliation</u>

53.     In response to the hostile and adverse treatment, Plaintiff complained on many

occasions to Morisset, Wilson, and Weber, both orally and via email, about the adverse treatment she alone was receiving.

54.     By way of example, Plaintiff complained to Morisset, Wilson, and Weber, about incidents which occurred regularly: 1) being over-scheduled for physician coverage (when others in the department were scheduled less), and 2) not receiving scheduled breaks and being unable to get co-workers to cover her for breaks (which did not repeatedly happen to Plaintiff's coworkers).

55.     Morisset, Wilson, and Weber repeatedly ignored her complaints. By way of one example, Plaintiff emailed all of her managers, in December of 2019, about not being able to receive coverage for lunch. Morisset replied that "they would look into it," but no one followed up with Plaintiff about it and nothing was ever done to alleviate the issue.

56.     At other times, she would be made to feel as if she had the problem. Morisset repeatedly told her in response to her valid complaints of unfair treatment, in sum and substance, "You have too many grievances."

57.     On several occasions, Plaintiff was reprimanded for complaining. For instance, the week of December 7, 2020, Plaintiff realized she was already over her 40-hour-work week because she was repeatedly asked to cover others' shifts. On Friday, December 11, 2020, Plaintiff informed Wilson that this was the case and that as her morning procedure had run into the afternoon, Wilson would need to assign coverage to the doctor she was assigned that Friday afternoon. Weber seemed to understand and agreed to find coverage. However, the following week, Weber called Plaintiff into her office where she berated Plaintiff for "abandoning her post."

58. Plaintiff's managers continued treating Plaintiff with hostile, discriminatory, and retaliatory conduct into the year 2021 and it increased substantially as the year 20221 progressed.

### Whistleblowing Followed by Additional Hostility and Retaliation

59. Plaintiff worked regularly with Shimona Morgan ("Shimona"), a co-worker who presents as a dark-skinned Black/Caribbean woman.

60. Plaintiff observed that Shimona frequently arrived to work late and disappeared during client sessions she was supporting, leaving everyone depending on her in the lurch. Simona also engaged in time theft by, *inter alia*, clocking in early while she leisurely ate breakfast, and failing to clock out at the end of her shift while she shut herself in an exam room and perused social media and charged her phone.

61. Shimona's conduct adversely affected Plaintiff's job because, in addition to doing her own duties, she also had to cover Shimona's duties whenever she abandoned her post.

62. Plaintiff also observed Shimona engage in workplace conduct that violated hospital protocol and medical regulations and created safety hazards for employees and patients.

63. For instance, upon information and belief, Shimona worked with wireless headphones in her ears, mishandled patient specimens, made errors regularly related to blood work and thyroid biopsies, and failed to relay message from the doctors to Plaintiff resulting in unnecessary miscommunications and patient delay.

64. Doctors and patients made complaints about Shimona's conduct. Doctors confided to Plaintiff that they had spoken to Morisset, Wilson, and Weber about Shimona to no

avail. The doctors told Plaintiff they had specifically requested to have Shimona removed, but Morisset, who handled the schedule, never complied, or took corrective action.

65.     During the months of May through August of 2021, Plaintiff made numerous complaints to her managers, Morisset and Wilson, about Shimona's conduct, but they said nothing in response, and upon information and belief, did nothing to investigate or remedy the situation.

66.     On or around August 24, 2021, Plaintiff arrived at work to find that patient biopsy specimens had been left to sit-out over the weekend, necessitating the recall of three patients to repeat their procedures. Plaintiff knew that Shimona had worked the relevant shift prior.

67.     Incredulous that despite the many times she informed her managers of Shimona's blatant misconduct, it nevertheless continued, Plaintiff immediately sent a message to her managers stating: "Upon sending out a FNA [fine needle aspiration] biopsy specimen for pick up this morning with CBL, I have come across THREE specimens that were not picked up from Friday August 20th. Unfortunately, these patients will now have to REPEAT these procedures since the cut off for room temperature is a max of 48 hours. I have made it clear in training that these send outs MUST be picked up or placed in the freezer before whoever is covering can go.  This is now a patient care issue…"

68.     The doctor who oversaw the procedures emailed the patients saying, "I am sorry to tell you this, but something went wrong with your FNA specimen and we need to repeat your FNA. It was no longer in my control, but we are rectifying any issues with specimen handling so this does not happen again…"

69.    Weber tried to address this major error, sending out a message saying: "Paula/Bernard, can we meet to go over the protocol and come up with a plan to prevent this from happening again? Thank you."

70.    Morisset (Bernard) responded to the e-mail immediately saying, "Indira, my next available time probably won't be until Friday. Bernard." Friday was three days later.

71.    Plaintiff was engaged in whistleblowing, shining a light on the severe safety violations occurring in the Department and management's abdication of responsibility to rectify employee misconduct causing harm to patients.

72.    Plaintiff is not aware of any follow up or disciplinary action taken regarding Shimona, Morisset, or Wilson.

73.    However, after the August 24th whistleblowing incident, Plaintiff was treated with an even heightened amount of hostility, aggressive, and passive-aggressive behavior from co- worker Shimona, and managers Morisset, and Wilson.

74.    On August 30, 2021, Plaintiff contacted Labor Relations and spoke to Terry Levine ("Levine"). Plaintiff complained of Shimona's dangerous workplace conduct and the hostile and discriminatory way she was being treated by managers after bringing it to their attention.

75.    Levine stated to Plaintiff that she would be contacting her managers regarding these issues.

76.    On September 8, 2021, Morisset and Wilson called Plaintiff into a meeting. Morisset yelled at Plaintiff and berated her for not working cordially with Shimona, and said Plaintiff had been accused of various misconduct, all of which was untrue.  Morisset

spoke of the "big accusations" Plaintiff had reported to Levine two weeks prior.

77.     Upon information and belief, the September 8, 2021, meeting was in retaliation for Plaintiff's complaint to Levine in Labor Relations. After Levine informed Plaintiff's managers about her complaints, Morisset and Wilson ambushed her in retaliation, yelling at her and falsely accusing her of misconduct.

78.     The retaliation continued into that day. Morisset falsely accused Plaintiff of leaving a patient to wait thirty minutes to have her blood drawn. Plaintiff explained she had been on a break and that another employee had agreed to cover. Plaintiff had nothing to do with the incident he described. Still, Morisset continued to taunt Plaintiff about the incident, causing her anxiety throughout the day.

79.     Plaintiff contacted Levine again, the afternoon of September 8, 2021, via email, stating in relevant part:

> This email is an extension of our conversations held on August 30th. As a general recap of our conversation, it directly relates to the conditions and stress at my job. I previously mentioned my concerns regarding an employee that has failed to follow protocol resulting in three interventional procedures needing to be recalled on patients. I am emotionally distressed and overwhelmed from today's meeting with my managers. Today I am questioning if my integrity and passion for patient care is leading towards reprisal...I feel as though I am being racially discriminated against and retaliated for bringing up prior issues to their attention...I am feeling very uneasy working here and on edge. I am just writing to update my working conditions being that they only seem to be getting worse instead of better. Thank you for your time.

80.     Levine's only response the same day was: "Thank you Jessica. Can you kindly remind me who your manager is?

81.     A day later, on September 9, 2021, Morisset and Wilson provided a formal written disciplinary letter, dated September 10, 2021, setting out their false accusations of her not communicating appropriately with her co-worker Shimona and other

trumped-up allegations.

82. Plaintiff emailed the document to Levine, September 9, 2021, stating, "I just wanted to update you with this write up that my managers are now trying to hand to me." Plaintiff goes on to describe why the accusations are false.

83. Plaintiff's email to Levine further states, in relevant part:

> *Yesterday I tried to express my concerns and feelings and Bernard's response was that he isn't responsible for my emotions…. I'm feeling very targeted and experiencing heart palpitations from this consistent seemingly racial/bias harassment. Following the "meeting" with Bernard and Paula yesterday, I was then antagonized with follow up emails all afternoon in regards to this patient after I informed him I was on break at that time. It made it very uneasy and a hostile work environment for me to get through my afternoon session yesterday…This is really taking a toll on my mental health and I am not understanding since none of this has ever been an issue or had a direct impact with my sessions, patients, doctors or work flow…thank you again for your time."*

84. Levine arranged for Plaintiff to speak with another Labor Relations representative approximately a week later. Plaintiff was hopeful that she would get some assistance to end the harassment and discrimination. However, nothing came out of the meeting.

85. On September 27, 2021, Plaintiff observed that Shimona again disappeared for a long period of time. In searching for her, Plaintiff was informed by another employee that Shimona had left for a break, again leaving patients without coverage.

86. Plaintiff emailed Morisset and Wilson about Shimona's abandonment of her post, stressing that Shimona's lack of communication could cause issues for the patients under their care.

87. Without reason, except to humiliate Plaintiff, Wilson's response to her complaint was to email the doctors that moving forward, Plaintiff would be delegated a 12 p.m. break and management would ensure coverage.

88. The following day, on or about September 28, 2021, Plaintiff again found a specimen

mishandled by Shimona and emailed Morisset and Wilson to report it.

89.     Plaintiff's email to Wilson, Morisset, Weber, and Archer stated in relevant part:

> *Upon my arrival I saw that Pathology pick up documented a biopsy specimen of a patient of Dr. Davies, … performed yesterday September 27th was mishandled. I raised much concern over the previous three incidents that involved three patients to be recalled. Please be advised that this is now the 4th incident within a month that compromised patient diagnosis. With the fourth incident, I was asked to fix the mistake; unfortunately, the sample has been contaminated due to improper specimen handling. The specimen has spilled within the bag and proper testing has been compromised. The results of so many recalls has never been a issue in the past. This is again a patient care issue. Please advise. Thank you.*

90.     In response, Wilson called Plaintiff into her office, allowing her to explain in person what had occurred. Plaintiff spoke of her concerns about the rate of procedures that were needing to be repeated due to Shimona's careless work and the physical cost to patients who had to repeat procedures. Wilson stated she would go down to check on the specimen.

91.     Plaintiff was engaged in whistleblowing once again, bringing to light the severe safety violations occurring in the Department, and the lack of responsibility by her managers to rectify employee misconduct resulting in harm to patients.

92.     When Plaintiff returned to her station after meeting with Wilson, she opened Morisset's response to her previous email that morning.

93.     Morisset's email to Plaintiff (sent on September 28, 2021 at 11:22 a.m.) read:

> *Jessica,*
>
> *Please don't include me in on this nonsense. Apparently you haven't been told, but you should know that I've requested through Labor Relations to not supervise or work with you any longer, and they support this. I've made this request based on your egregious accusation against me for Racial discrimination/harassment through Labor Relations, which you know you could not provide proof or evidence of. Basically, you lied. Do you know how serious an accusation this is, especially in the socio-political climate that we live in today? Of course you do. Why else would you reach to pull the race card using*

*your perceived "power" as a white woman towards your black supervisor? All this because you lack accountability, and as we all have discovered through this false claim, you also lack integrity.*

*I refuse to work with someone whom I cannot trust. Stop emailing me.  You can reach out to Indira or Paula with any of you (sic) many grievances.*

*Bernard*

94. Plaintiff, who had been working and suffering under a hostile work environment, which had escalated in severity and frequency in the last year, broke down upon reading this accusatory, patently hostile, and discriminatory email from her direct supervisor.

95. Wilson came upon Plaintiff appearing distraught at her workstation. Wilson pulled Plaintiff into a private room in an attempt to calm her. Plaintiff continued to shake and weep. Plaintiff then told Wilson, in sum and substance, that she was uncomfortable being at work and wanted to leave to see her doctor.

96. Wilson responded, in sum and substance, that she should not take it personally, Morisset was just upset and writing out his emotions.

97. Plaintiff was denied permission to depart work and had to continue working under extreme distress.

98. Later that day, September 28, 2021, Plaintiff forwarded Morisset's email to Levine, stating in part: "I am extremely anxious being at work…I no longer feel comfortable in the same setting as he is. For now he seems to have taken the situation personal and not professional This is not the first time he has spoken this way to me which is why I came forward."

99. Levine responds hours later with, "Thank you for bringing this to my attention. I will be looking into this. Best regards, Terri."

100. Once again, Plaintiff was left not knowing what, if any, action was being taken.

101. On September 30, 2021, Dominque Archer ("Archer"), the director of the Department, called Plaintiff to a meeting. Archer stated, in sum and substance, that Plaintiff should have a meeting with Morisset after he returned from his PTO on October 5, 2021. Archer continued, in sum and substance, that Plaintiff deserved an apology from him.

102. Plaintiff expressed her fear and concern about having another confrontation with Morisset.

103. Archer stated, in sum and substance, that she wanted to clear the air because, "He [Morisset] is not going anywhere and you're [Plaintiff] not going anywhere."

104. Plaintiff was consumed with fear and anxiety about the upcoming meeting, but without further communication about the incident, it never did occur.

105. Upon information and belief, Labor Relations failed to act on Morisset's hostile and discriminatory message at all.

106. When Morisset returned from his PTO, he continued to discriminate and retaliate against Plaintiff.

107. Morisset also continued to schedule Plaintiff to work with Shimona despite the complaints from doctors, patients and herself about her performance.

108. Shimona, who upon information and belief, knew about Plaintiff's complaints about her misconduct, ramped up her hostile and passive-aggressive conduct towards her.

109. For instance, Shimona would purposely leave rooms dirty, the nurse's station in disarray, and the lab unstocked, knowing that it would fall upon Plaintiff to clean up.

110. On one occasion, Shimona shoved a piece of medical equipment into her. Later she texted her: "Sorry for pushing the bp machine towards you, I thought you were asking

for it. Enjoy your lunch break!" Plaintiff did not see this as an authentic apology, but as a veiled dig based on the ongoing harassment.

111.    On November 4, 2021, Plaintiff discovered that Shimona had blatantly violated medical policy by releasing blood work under Plaintiff's name. Upon information and belief, this was done as another act of hostility against Plaintiff, and the consequences could have been severe.

112.    In response, Plaintiff sent another email to Wilson (no longer including Morisset after his intimidating and discriminatory email directing her not to contact him), to report the lab violation along with the continued hostile environment created by Shimona. The violation was not acknowledged, and no action was taken.

113.    Morisset continued his campaign of retaliation by overbooking Plaintiff on the schedule by, for instance, covering two physicians at once while she also was responsible for covering additional procedures.

114.    Despite continued complaints to Wilson, and now also Archer, the situation was not rectified, continually leaving Plaintiff and patients in unsafe and untenable circumstances.

115.    Plaintiff was regularly forced to work non-stop shifts without relief for breaks.

116.    On November 4, 2021, Plaintiff emailed Levine in Labor Relations, reaching out again with the hope that Labor Relations would assist her. Plaintiff wrote:

*I have spoken with you before about the harassment and retaliation I have been enduring and that is it because of my race or color. Bernard was upfront about this is his email to me on Sept. 28th.... the hostile treatment in the department is as bad as ever. It doesn't appear that any action is being taken. I've tried to go to my supervisors and managers, but they are part of this, and then I am further retaliated against. Apparently this department can't help me either. The situation is taking a toll on my health. I am experiencing anxiety, digestive and sleep problems. It is very hard to work each day knowing that I have to keep being treated like this.*

117.   On November 23, 2021, Plaintiff requested Shimona cover her break. While on her break, a front desk worker came to her to tell her that no one was covering her shift as Shimona decided to walk out on her own, abandoning Plaintiff's duties that she agreed to cover. Plaintiff emailed Wilson about the incident as she believed it was purposeful retaliation.

118.   On December 1, 2021, Plaintiff was again given a poor performance evaluation, not indicative of her high-quality and dedicated work.

119.   Plaintiff's complaints to management and Labor Relations were repeatedly ignored and mishandled. Levine told Plaintiff, in sum and substance, that she should not take these things so personally and that her allegations were hard to prove. Levine's response on another occasion was to ask Plaintiff what she wanted Labor Relations to do about it (meaning her complaints of discrimination and safety misconduct violations). Levine also told Plaintiff in sum and substance, "You always have the option to leave."

120.   Upon information and belief, Labor Relations never conducted an investigation related to Plaintiff's ongoing and repeated allegations, despite the documentary evidence of discrimination and violations of patient care and safety, including Morisset's intimidating, retaliatory and racially motivated email.

121.   As a result of the repeated incidents of aggression, hostility, and retaliation from her managers and co-worker, Plaintiff was experiencing extreme emotional reactions.

122.   Plaintiff sought treatment from Doctors and the Emergency Room on several occasions due to the stress.

123.   Throughout the Fall of 2021, Plaintiff dreaded coming to work each day, a job that she

had previously loved and that she excelled in.

124.    In or around late November, Plaintiff experienced such severe emotional and physical distress that she took more and more time off work.

125.    Finally, unable to cope with the abuse, discrimination and hostile work environment any longer, and totally defeated by Labor Relations lack of concern or action, she was forced to resign under duress.

Defendant's Legal Culpability

126.    Defendant engaged in a long campaign of discrimination against Plaintiff, because of her race, color and national origin, adversely affecting the terms, conditions or privileges of employment.

127.    Defendant is strictly liable for the discrimination as Plaintiff's direct supervisors subjected Plaintiff to a hostile work environment, on an ongoing basis, because of her race, color and national origin and causing her constructive discharge.

128.    Defendant were aware of and failed to take action or rectify the discrimination or ongoing hostile work environment caused by Plaintiff's supervisors and co-workers.

129.    Defendants were aware of the discrimination as Plaintiff made numerous complaints about the discrimination, bringing it to the attention of her managers and Labor Relations repeatedly, and no action was taken to rectify the illegal conduct.

130.    Plaintiff, as a whistleblower, informed her superiors and Labor Relations repeatedly about violations of hospital and medical protocols which harmed patients and caused safety risks.

131.    In response to Plaintiff's protected activity, complaints of discrimination and whistleblowing, Defendant retaliated against Plaintiff, subjecting her to further

21

harassment, ongoing adverse actions up to and including constructive discharge.

132. Upon information and belief, no investigation has taken place in relation to Plaintiff's complaints and no employee of Defendant has been disciplined for discriminatory or illegal conduct.

133. As a result of Defendant's actions, Plaintiff felt, and continues to feel degraded, powerless, humiliated, and emotionally distressed.

134. As a result of Defendant's discriminatory and intolerable treatment of Plaintiff, she suffered, and continues to suffer, severe emotional distress and physical ailments.

135. As a result of the acts and conduct complained of herein, Plaintiff has suffered, and will continue to suffer, the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails.

136. Plaintiff has also suffered future pecuniary losses and emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

137. As Defendant's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages.

138. Defendant's actions and conduct were intentional for the purpose of harming Plaintiff.

## AS A FIRST CAUSE OF ACTION
## DISCRIMINATION UNDER TITLE
## VII

139. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

140. The claim is authorized and instituted pursuant to the provisions of Title VII for relief based upon the unlawful employment practices of Defendant.

141. 42 U.S.C. §§ 2000e-2 states:

> It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to him compensation, terms, conditions, or privileges of employment, because of such individual's race, color, … or national origin…

142.   Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. §§ 2000e by discriminating against Plaintiff because she was a light-skinned Latina.

## AS A SECOND CAUSE OF ACTION RETALIATION UNDER TITLE VII

143.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

144.   42 U.S.C. §§ 2000e-3 states:

> It shall be an unlawful employment practice for an employer to discriminate against any of him employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by the subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the subchapter.

145.   Defendant engaged in unlawful employment practices prohibited by retaliating against Plaintiff for complaining of the aforementioned violations.

## AS A THIRD CAUSE OF ACTION DISCRIMINATION UNDER THE NYSHRL

146.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

147.   Executive Law §296 provides that "1. It shall be an unlawful discriminatory practice:

"(a) For an employer or licensing agency, because of an individual's … race, …color, national origin,… to refuse to hire or employ or to bar or to discharge from

employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

148. New York State Executive Law § 296(1)(h) provides that, "It shall be an unlawful discriminatory practice: (h) For an employer…, to subject any individual to harassment because of an individual's…race…color, national origin …, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint…regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions, or privileges of employment because of the individual's

149. Defendant engaged in an unlawful practice by discriminating against the Plaintiff because she is a light-skinned Latina and subjecting her to a hostile work environment

150. Plaintiff hereby makes a claim against Defendant under all of the applicable paragraphs of Executive Law Section 296.

### AS A FOURTH CAUSE OF ACTION
### RETALIATION UNDER THE
### NYSHRL

151. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

152. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

> "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."

153. Defendant engaged in an unlawful discriminatory practice by retaliating against the Plaintiff for complaining of the aforementioned violations.

## AS A FIFTH CAUSE OF ACTION
**DISCRIMINATION UNDER THE
NYCHRL**

154.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs

of this Complaint.

155.   The Administrative Code of City of NY § 8-107 [1] provides that,

> It shall be an unlawful discriminatory practice: (a) For an
> employer or an employee or agent thereof, because of the
> actual or perceived…race,… color, national origin,…to refuse
> to hire or employ or to bar or to discharge from employment
> such person or to discriminate against such person in
> compensation or in terms, conditions or privileges of
> employment.

156.   Defendants engaged in unlawful discriminatory practices in violation of the New York

State Executive Law § 296(1)(a) by creating and maintaining discriminatory working

conditions and otherwise discriminating against Plaintiff because she is a light-skinned

Latina.

## AS A SIXTH CAUSE OF ACTION
**RETALIATION UNDER THE NYCHRL**

157.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs

of this Complaint.

158.   The Administrative Code of City of NY § 8-107 (6) forbids retaliation for engaging in

protected activity.

159.   Defendant engaged in an unlawful discriminatory practice by retaliating against

the Plaintiff for complaining of the aforementioned violations.

## AS A SEVENTH CAUSE OF ACTION
**RETALIATION UNDER THE NY WHISTLEBLOWER
STATUTE**

160.  Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

161.  The Labor Law of NY, Chapter 31, Article 20-C, § 741 (2) prohibits a health care employer from taking any retaliatory action against an employee who (a) "discloses…an activity, policy, or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care or improper quality of workplace safety; or (b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care or improper workplace safety.

162.  Plaintiff repeatedly complained to her supervisors and Defendant's Labor Relations Department of activities, policies, and practices that constituted improper quality of patient care and improper workplace safety.

163.  Defendant ignored and failed to investigate or effectively remediate such practices.

164.  Defendant engaged in an unlawful discriminatory practice by retaliating against Plaintiff for complaining of the aforementioned violations.

## JURY DEMAND

165.  Plaintiff each requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A.  Declaring that Defendant engaged in, and enjoining Defendant from continuing to engage in, unlawful employment practices prohibited by Title VII, the NYSHRL, and

26

the NYCHRL, in that Defendant discriminated and retaliated against Plaintiff on the basis of her color, race, and national origin.

B.      Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful discrimination and retaliation and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to him reputation in an amount to be proven at trial;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

F.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices against each of them.

Dated: New York, New York
December 8, 2022

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By:     _____
        Michelle A. Caiola, Esq.
        Jonathan Goldhirsch
        *Attorneys for Plaintiff*
        45 Broadway, Suite 430
        New York, New York
        10006
        (212) 248-7431
        mcaiola@tpglaws.com
        jgoldhirsch@tpglaws.com